HANDAL & MOROFSKY LLC
   COUNSELLORS AT LAW

PLEASE REPLY TO:
CONNECTICUT OFFICE

May 20, 2026

Hon. Gregory H. Woods                **VIA ECF**
United States District Judge
Southern District of New York
500 Pearl St.
New York, NY 10007

      Re:    ***Cardinal Motors Inc. v. H&H Sports Protection USA Inc.***
          ***1:20-CV-7899-GHW -file on the ECF only***

Dear Judge Woods:

    This letter responds to Defendant's letter of May 13, 2026 respecting its request for a pre-motion conference on Defendant's anticipated summary judgment motion.

    After rejection by the Second Circuit of Defendant's attempt to avoid liability on the theory that the definition of the trade dress was not set forth with the requisite specificity, Defendant now proposes an entirely new theory, citing the fact that the business of Plaintiff Cardinal Motors ("Cardinal") brings its designs to the public through sales substantially all of which are made by Cardinal's licensee Bell Sports. This belatedly raised issue rests on a fact which was clearly and explicitly set forth in the Complaint, as filed, and, accordingly, has been known to Defendant for six years.

    More importantly, the assertion is completely without merit. Essentially, Defendant is urging that a business whose product is design services is inherently incapable of gaining goodwill with end-user consumers whose actions drive the designer's business.

    Trademark law protects the products of sellers of both goods and services. Trade dress protection is a subset of trademark protection and is governed largely by the same rules and principles. In the present case, Plaintiff Cardinal is in the business of designing helmets and providing those helmet designs to the public. Plaintiff's design services and resulting product configurations can acquire goodwill at multiple levels of trade. Moreover, the designs themselves can acquire secondary meaning and, as such, the configurations, embodied in products purchased by consumers, may be enforced by Cardinal as trademarks.

    <u>Chain of Commerce.</u> Nevertheless, Defendant contends that somehow, because the commercial connection between Cardinal and the end user consumer consists of multiple commercial stages, trade dress rights cannot exist.

    However, there is nothing remarkable about a multistage commercial structure. "The [Lanham Act] does not expressly require formal corporate control, as the district court suggested. Instead, the statute requires control over only the 'use of the [trade dress] … with respect to the nature and quality of the goods or services,' which may include not only corporate control but also licensing agreements and other types of oversight." *Estate of Coll-Monge v. Inner Peace Movement,* 524 F.3d 1341, 1348 (D.C. Cir. 2008). For example, many types of goods are

WRITER'S DIRECT DIAL: 917 880-0811
email: handal@HandalGlobal.com  website: www.HandalGlobal.com

produced by a manufacturer, sold to a middleman wholesaler, who then re-sells the product to a retailer, who then, in turn, sells the products to end user consumers.

In this very typical scenario, the manufacturer is separated from the consumer by several layers of commerce. Nevertheless, if we consider a product bearing a trademark applied to it, the consumer's perception of the product, and the goodwill associated with the reputation of the trademark owner, is the product not only of the manufacturing process, but also the handling of the product by, for example, wholesalers and the retailer. "'Ownership rights in a trademark … can be aquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made … by the licensee.'" *Hawaii-Pacific Apparel Group, Inc. v. Cleveland Browns Football Co.*, 418 F.Supp. 2d 501, 506 (S.D.N.Y. 2006) quoting 2J. Thomas McCarty, *McCarthy on Trademarks & Unfair Competition* § 18.46 (4th ed. 2004).

Given the commonality of multilayer commercial delivery mechanisms, many manufacturers assure that consumers receive quality goods do not sell products to just anybody, but only to factory authorized resellers who are selected for the care with which they participate in the transaction from the manufacturer to the end user consumer. This is no small matter.

Licensed Use. The licensing of a design, embodied by a manufacturer into a product with a particular appearance, and which then proceeds down the chain of commerce to the end user consumer who purchases the product with the protectable trade dress is no minor technicality. A wholesaler with poor facilities may expose the product-to-product damage, for example rain damage in a facility with a leaky roof. The shipping company or warehouser with careless personnel may damage the product in handling it. Manufacturers protect their reputations by only doing business with companies they believe will execute their tasks with a level of care which will protect the reputation of the manufacturer.

In this case, Cardinal licensed its designs to a premier helmet manufacturer, Bell Sports, thus ensuring that its high-quality designs would reach the public in a high-quality product. Moreover, Cardinal remained intimately involved in the design and evolution of the Bullitt, thus ensuring consistent and high-quality meeting its standards. This continued involvement in evolution and design is memorialized in paragraph 3.2 of the license agreement which Incorporates a "Consulting Agreement."

Defendant seeks to separate Cardinal's directly rendered design services from the manufacturing licensed by and participated in by Cardinal. Defendant gives no factual or legal basis justifying its argument that businesses furnishing design services are not entitled to the full range of trademark rights.

Nevertheless, Defendant pushes the point with a number of illogical constructions.

First, Defendant asserts that Bell Sports manufactured the bullet helmet before Cardinal. This makes no sense, because the transaction from designer Cardinal to the end user consumer is *a single transfer of product to the end user consumer*. That transfer of product through the chain of commerce originated with Cardinal which started the process with its design work and which made the first commercial transfer of rights by license to Bell Sports before Bell Sports manufactured the helmets.

Next, Defendant asserts that there was no agreement between Cardinal and Bell Sports licensing the design. In fact, there was such an agreement. This agreement included a written license agreement (Exhibit A) specifically licensing the design of design patent D661,027, which embodies the trade dress, to Bell Sports. Produced below is an illustration from design patent D661,027:



FIG. 1

The license agreement specifically provides for the license of "Licensed Articles" which is defined as the "products… specified in Exhibit A of this agreement." Exhibit A simply reads "LICENSED ARTICLES: Bullet Model Helmet", and thus by definition covers the Bullitt.

In addition, while Defendant may argue that the written agreement mentions the design patent, that agreement necessarily includes a license of the designer Cardinal's trade dress rights. Simply viewed, Bell is permitted to do the design under Cardinal's rights. Moreover, the payment of royalties to Cardinal by Bell Sports for many years further evidences the existence of a license of trade dress rights between Cardinal and Bell Sports, and the terms thereof.

Moreover, Defendant also makes the argument that Cardinal cannot prove priority of use over Bell Sports. Of course, as a licensee of Cardinal, Bell Sports has no rights. The argument also misconstrues the meaning of priority rights. The doctrine of priority only applies between two parties claiming rights. Defendant cannot claim rights of Bell Sports. Defendant's date for priority purposes is the date that Defendant began using the trade dress. There is no factual dispute that use of the trade dress by Defendant was subsequent to use by Cardinal's licensee Bell Sports.

Likelihood of Confusion. Next, Defendant contends that in the highly fact-intensive weighing of the Polaroid factors, and despite clearly intentional copying, almost identical appearances, direct competition, licensing to a major US manufacturer, numerous articles and other publicity, etc., a reasonable juror could not find in favor of Cardinal. The contention is frivolous on its face.

No Single Feature Is the Trade Dress. Defendant presses the argument that each feature is a trade dress. The error to which this argument led Judge Crotty was resolved against Defendant by the Second Circuit. No factual justification or argument, let alone any compelling one, is made in Defendant's letter, and the contention is, respectfully, properly dismissed.

While functionality is mentioned no facts supporting Defendant's position are given.

Finally, Defendant suggests that some of his helmets are closer to the original Bullitt than others and that value of the Complaint to show every infringing design is an expansion of the claim. However, Defendant has produced evidence of sales of its various helmets, and it is up to the finder of fact to determine which of those albeit relatively close designs infringe.

Very truly yours,

Anthony H. Handal